The Court had granted a motion to separate out graves, and the parties were wondering, on the calendar it appears that the non-graves case are going first, and then the graves case is going last? Yes. Okay. So this is graves. We'll go ahead and state your appearance and who you're appearing for. I please the Court. My name is David Schlesinger, and I personally represent Appellant Terry Hollins. Also appearing with me at council table is David Zugman, who represents Marcus Foreman. With the Court's indulgence, I would like to begin by arguing the Feretta issues for Mr. Hollins, Mr. Foreman, and Mr. Ross, and, time permitting, then segue to our Fourth Amendment and Title III claims regarding the jailhouse recordings. That should take, if I manage our time correctly, approximately eight minutes, and then Mr. Zugman will be arguing our Batson issues for approximately four minutes, and then, time permitting, we'd like to reserve some time for rebuttal. Of course, I'd be pleased to answer questions about other issues that the Court has. Go ahead and get to the point you want. Thank you, Your Honor. Regarding Feretta, all three of those particular appellants, Hollins, Foreman, and Ross, have unique elements and compelling elements to their Feretta claims. Beginning with Mr. Hollins, his is a classic quintessential one, and there are several reasons why this is so. First, Mr. Hollins unmistakably, unequivocally invoked his Feretta rights. He had a knowing, voluntary, and intelligent acceptance of the understanding of invoking those rights. Second, he was competent to do so. And third, and then most importantly for purposes of this appeal, he accepted all, every single one of the onerous conditions that the District Court imposed on him as a condition for proceeding pro se. Perhaps the most important of those was that Mr. Hollins decided, as of January 28, 2016, which was eight days before the trial was to begin, he decided he didn't need a continuance. He had long told the District Court that he was willing to abide by the District Court's attorney-eyes-only order, which prohibited him from getting any access to discovery, indeed even the identity of core government witnesses, 48 hours before those witnesses' appearances at trial. He agreed that he was going to be shackled at counsel's table and would not be permitted to move about during the proceedings. He also agreed that he would not be permitted to participate in attorney-directed voir dire during jury selection. So notwithstanding Mr. Hollins' having unequivocally accepted all those conditions, the District Court nevertheless decided that Mr. Hollins had done so for bad faith and for purposes of delay. Simply put, that is an inference that cannot logically be drawn from the District Court record. As for Mr. Foreman, that's where Judge Pius' opinion for the court in United States v. Farias comes to play. Mr. Foreman, I see you're shaking your head, Your Honor. I'd be curious as to why you're skeptical of that. Well, we would think- I've got to confess that a lot of times people point to my prior opinions. I have no recollection of it whatsoever. So it could be that I did that. Well, that was me then. Well, let me explain why we think- Well, let's look at Farias. I mean, Farias is a different kind of case in terms of the importance of trying to hold to a trial date, for example. And Farias emphasizes the obligation on the court to make sure that there is an effective opportunity to proceed. And the question that I guess that may have driven the trial court in this context is that after several times equivocating with regard to his readiness to proceed on the trial date, I'll try, and so forth, seeming to leave a foot in the door or fingers crossed behind his back, Mr. Hollins finally says, okay, I'll go to that date. But does that prevent him from coming back later and saying, you know, I tried, but there's just not enough time, I need more time, this trial date can't hold. And Farias gives him something to work with in suggesting that there has to be a sufficient opportunity to be able to mount an effective- Certainly, Your Honor. I think what's unique about this case is that the district court was firm and consistent from hearing to hearing in that the February 8, 2016 trial date was not going to be changed. He had previously continued the date from a day in January, but that was because of a unique circumstance regarding one of the- It was a health issue. Yeah, or I believe it may have been a personal issue regarding one of the attorneys for a defendant who ultimately ended up pleading guilty, Mr. Bandy. So this district court, this district judge has a practice of having very firm trial dates. So every single defendant was on notice that there was not going to be any opportunity whatsoever to deviate from that. And so regarding Mr. Hollins and Mr. Foreman, Mr. Hollins ultimately decided eight days before trial that he was willing to proceed under those onerous conditions. Mr. Foreman essentially constructively had his forerunner rights taken from him because he had requested continuance on January 14, 2016, which was 25 days before the trial date, and ended up withdrawing it once the district judge informed him that that was not going to be a possibility, that he was going to have to proceed as planned on February 8, 2016. So we think Farias firmly controls Mr. Foreman's claim, his VRETA claim. If there are no further questions regarding those two defendants, I'd like to turn quickly to Mr. Ross's VRETA claim before I turn over the podium to my counsel. Sure. My colleague, Mr. Suggman. Mr. Ross did, and we acknowledge this, he did untimely invoke his VRETA claim during trial. If this court believes that cases such as Bishop, Schaff, and Smith have been set in the brief's control and create a categorical rule of an untimeliness bar, then the VRETA claim would fail. We don't read those claims that broadly, and therefore, like the district court, which was grappling with balancing tests that the Third Circuit developed in Bancroft and the Second Circuit developed in Matsushita, we think that under the circumstances, given that the trial was already sufficiently advanced and Mr. Ross was willing to proceed pro se immediately, there wouldn't have been any meaningful change in the trial trajectory. And Mr. Ross was prepared to proceed immediately pro se. So therefore, under those balancing tests, his VRETA rights were violated. If there are no further questions regarding VRETA, I'd like to turn the podium over to Mr. Suggman to argue our Batson-related issues. May it please the Court, David Suggman on behalf of appellants. I represent in particular Marcus Foreman. So the Batson issue. The Batson issue in this case is unique because ordinarily we have a Batson claim where we have a minority juror who is struck, and there's no dispute that the juror who the peremptory challenge was issued to was a minority juror, and usually the prosecutor gets up and says, here are my race-neutral reasons, and the district court makes a call. But in this case, we have that twist. We have the fact that after the prosecutor stated his putatively race-neutral reasons, the prosecutor then says, we offer to exchange one African-American juror for another. And it is our position that that proves, rather than ameliorate the issue of race, that proves, I mean, at least from the outside world to the whole world, it seems like, well, we'll take this other juror based on race. And although I could not find any cases which applied the racial balancing tests of the school district case, which I guess is not terribly surprising, applied it to a Batson scenario, I think that the logic should be clear that the Supreme Court's pronouncements that the way that you eliminate racial discrimination in the criminal justice world and in our justice system is by not using race. Well, there wasn't a swap of the jurors, and so I'm not sure how that gives you any traction with regard to the jury that was actually seated. If it speaks to anything, it may have been a misguided suggestion, but it does suggest that the government's focus on the exercise of the may have been driven by something other than the prospective juror's race because they're willing to say, well, put somebody else in there. And I understand that point, Your Honor, if I may. It seems, though, that if you consider the nature of this case, now the government says that at the beginning of Vordeer, Judge Sabraw says this is a very diverse panel, which was already noting the racial aspect. The defense had said, wait a minute, why aren't there more African-American jurors, which, of course, noted the racial aspect. There were three African-American jurors on the possible panel. One was excluded because the person knew law enforcement witnesses in the case, so that's an obvious one. And then we have Juror 14 and Juror 47. Juror 47 appeared to be in no danger of making it to the panel. There wasn't going to be enough jurors struck. But Juror 47 was the child of a police officer, and I could see why the government would want a person of any race who was raised by a police officer to adjudicate this case. And whether that was just clever pool or was an interesting suggestion, it's unquestionably a racial suggestion, the whole point. It doesn't suggest the challenge that was exercised was motivated by race. If I want to select somebody to be on the jury because of their race, that is just as much a racial suggestion as wanting to exclude somebody. Only a person wasn't put on the jury by reason of race. I mean, if the court had accepted that proposal, we'd have a whole different set of issues to discuss, but that's not what happened. So I'm not sure how this really speaks to the prosecutor's motivation in exercising the challenge that was exercised. We all agree that this is a factual question based on the totality of the circumstances. So when the prosecutor got up and listed the several reasons, the several possible race-neutral reasons for excluding the juror, and then the judge made the call, we think the judge should have factored in the fact that the prosecutor offered to swap out the other African-American juror, that that put a racial tinge on the prosecutor's motivations. Well, you're arguing to me now, and I hear you, and I don't understand how that strengthens the argument that the prosecutor's exercise of the challenge that was exercised was motivated by race. I don't see how that strengthens that argument. Well, I mean, I think we've all had the experience. The prosecutor was conscious of race, yes, but that's the world in which we live. And it was prompted at that point by the Batson Challenge. So he has to concentrate on race. The beginning of the Batson Challenge was the government saying, look, you haven't made a prima facie case, but here are my six reasons why this is race-neutral. And the government's argument on appeal is if you consider these points in combination, they're different than every other juror. Our point is this was the one African-American juror who was going to make it to the panel. And the government challenged that juror. We make a Batson Challenge. The government gives racial-neutral reasons. And then at the end, which reason's only known to the government, they decide to say, well, it's kind of like when you say, look, I'm not racist. I have a black friend. And it kind of proves the point that you were making an assessment about the person's race in your decision. So I note my time is growing short. I'd like to reserve a minute for rebuttal. Thank you. Let's see. It's going to be the Fourth Amendment, too, I thought. Let's just go to the government. Thank you, Your Honors. May it please the Court, Mark Rahe for the United States. The government would submit in this case that Judge Sabraw did not commit clear error in finding bad-faith reasons for the FRED motions. And as we point out in our briefs, the district court, I believe, from Excerpt of Records 67 to 74, very conscientiously considered this issue and set forth a number of reasons. And as we also point out, one of the factors in a FRED-ed challenge that this Court made clear in 1982 in Fritz v. Spalding and also in the Ted Kaczynski Unabomber case was whether the defendant could reasonably be expected to have made the motion at an earlier time. Here, the defendants, at least Hollins and Foreman, waited until 20 months after the case was indicted and just a few weeks before trial to make a claim. And particularly with respect to Hollins, that was after there had been zero concerns about his counsel before then. In fact, he concurred with the court. The counsel had done a very good job and even spared him from the death penalty. Now, I understand that that's not dispositive, but I want to lead with that because according to my read of the case, while that's still a very relevant factor, this court in the United States v. Kaczynski said if there are amicable relations between counsel and the defendant, that certainly gives pause as to any eve of trial request for new counsel. Now, Judge Subraw was aware of all the correct legal principles. He still admitted that this was timely, and this court in Fritz v. Spalding said as long as the motion is made before the jury is impaneled, it's timely. But this case isn't just in a vacuum. On its unique circumstances, the fact that it was made 20 months after indictment and maybe three weeks before trial still meant that it was on the eve of trial. And the only representation that the defense made, or at least that Mr. Hollins made, was that he just felt he could do a better job. Now, it is his right. Even Judge Subraw acknowledged multiple times below, you have a constitutional right to represent yourself. When this first came up on January 14th, Judge Subraw can read that hearing, dutifully went through all the colloquy. There's never been any claim on appeal that he was short or gave short shrift to that. At the end of that hearing, both Hollins and Foreman withdraw their requests. So now they flip-flop. Two weeks later, Hollins comes back into court and says, you know what? I think I still want to go pro se. Now, another important fact, when both Hollins and Foreman made their initial motions January 14th, there's no question they're asking for continuance. And as this court's case law has pointed out, whenever a motion to go pro se is coupled with a request for continuance, that's strong evidence of an intent to delay. Even at the second hearing, January 28th, when Hollins comes back into court, his first preference is to have more time. And I understand that, you know, as soon as the court said, look, we're not going to move the trial date. Incidentally, I would also point out, you know, maybe like Farias, that was a run-of-the-mill 1326 case where the defendant's arrested, trial's going to go forward four months later. Not a lot of witnesses. It's usually a one-day trial. In United States v. W.R. Grace, this court said that a court, a district court has inherent power to control its docket. This was an enormously complicated case. I think there were 17 or 19 defendants indicted. As you go through trial, even my opponent conceded earlier this morning that it was no question to the appellants that given the scope and the enormity of this case, continuances would only be given for extraordinary reasons. And of the two continuances that were given, that was true. One of them was so that the death penalty question, the mitigation package process for defendants Grace and Hollins could run its course, which took some time. And the other one was when, I believe, another one of the defense counsels lost her home. Even in their reply brief, the defense admits that even if they don't ask for a continuance, the fact that a continuance would be acquired is also evidence of bad faith for these purposes. Well, I mean, let's . . . Yeah. A Feretta motion is a real problem for a district judge, particularly in a case like this, because the right to real self-representation is established. Correct. And I don't quarrel with what the district court was doing in trying to weigh the elements, but after he's told defendants that we're not continuing this and they wind up withdrawing the request. And a couple weeks later, Mr. Hollins comes back and says, you know, I've really thought about this, and I know this. It's my, not life literally, but my 40 years that are on the line. And the Supreme Court says he's got the right to do that. There was the crossing of the fingers that I referred to myself before, but in the end he says, okay, I'll take it. So what's the downside? What is it the court can point to to say, I still think this is for delay, given that the record at that point, it seems to me, would make it very difficult for Hollins to argue later that my conviction has to be tossed out because I wasn't given enough time to prepare? I think, well, exactly. I think part of that is, you know, I believe that Judge Sobral referred to as a Hobson's choice. I mean, you know, first of all, just accepting that it's a credible request at face value, that I'm going to go to trial without any of the discovery that the lawyers have had access to for a long time. But he's got other lawyers sitting there next to him. If he's doing it by himself, maybe he figures he can get by with them and he knows better. I mean, one of the things about criminal defendants, if they had good judgment, they wouldn't be criminal defendants. So he may well have persuaded himself, I can do a better job than this guy who's been representing me, and they've got other guys here who are going to be doing the job too. So can we be so confident that the request was in bad faith, that Hollins really had an ulterior motive that he was going to be able to realize? I believe you can, Your Honor. And another point, and to speak directly to that, and there was no mention of this in my opponent's presentation, the district judge at Exeter Record 7273 found it wasn't just about delay, and again, it has to be good faith reasons, the court found that there was improper desire to circumvent the AEO protective order. And the court pointed out, didn't just pull that out of the blue, said, on December 22, 2015, I made a fundamental change in the landscape of this trial. Up until that point, the idea always was that I believe everybody would get all core witness discovery six weeks before trial. But what the government introduced were affidavits, one of them's at Exeter Record 645-49, that's from Special Agent Oliver, that Hollins was using Facebook to intimidate potential witnesses. And, you know, this was a problem that had gone on. Obviously, that was the allegation to the murder of Parris Hill. FBI Agent Katie Harding also submitted an affidavit, a supplemental excerpt to Record 323-24, that Hollins had intimidated witness 15, that's set forth there. He had a demonstrated proclivity during this case to intimidate witnesses. And what the district court said was, I'm inferring based on the fact that December 22, 2015, the three weeks before you suddenly make this threat or request, after 20 months of silence and a perfect relationship with your counsel, that you think you're going to be in the same shoes as the lawyers and you're going to get earlier access to the core discovery. Now, we may, you know, you reviewing that de novo may not agree with it, but on the finding of bad faith, we submit that it's clear error. Here, the court is specifically pointing to this kind of evidence. You've got these affidavits from two different FBI agents that there's a real problem with witness intimidation. I think that is another reason that goes to bad faith. Well, the order itself is not challenged here. And I can understand the reason for the court's decision to withhold the information. But the second time Mr. Hollins comes up, it is argued at least that he knows that's what the court's ruling is. How does asking to represent himself change the posture of that issue? Because I believe the district court can implicitly reject that it's not credible. Here you have a defendant who has been knowingly engaging in intimidation, and just because he suddenly says what he thinks the judge wants to hear, the judge is entitled, I believe, to make an implicit adverse credibility decision on that respect. But how does it affect the case? Hollins may think by stepping forward himself he's going to get the information, though the judges said no. Hollins now says the words that I'll live with this. From the court's perspective, does that make the court's prior decision with regard to withholding the information, even from Hollins acting as his own counsel, does that put his prior decision in jeopardy? I don't believe it puts it in jeopardy, but at least, you know, if it's going to be clear of you and you look to the totality of what's informing the judge's decision, and if the overall question is good faith or bad faith, the judge, I believe that's not a random leap, because I believe in the reply brief that, you know, my opponent said, oh, it's just speculation. He has demonstrated evidence of a proclivity to disobey already the law in not intimidating people. I mean, it may not go so much to the issue of delay, but I think it goes to good faith, bad faith. Now, another point I wanted to make is that the case law always says, even when a defendant says that he doesn't want a continuance, and let's just say that's the only thing that Defendant Hollins said, I believe Fritz v. Spalding says whether a continuance would still be necessary, something that the court can take into consideration, and I believe that's what Judge DuBois is referring to as this Hobson's choice, you know, where he says you have a right to meaningful, not just self-representation, but meaningful, and for you to now come up and say without any, you know, prior exposure to a lot of the discovery that you're going to be able to represent yourself, that puts me in a bad position, because now, you know, it's almost like you're damned if you do, damned if you don't. And again, I point this out only because I believe that this record shows that the judge is able, it's within his power to not give those representations their face value, and especially when, after the first time there was a request, it was withdrawn. And then he comes back two weeks later. You know, and one other thing I would point out is that there still would have been, I believe, massive prejudice to the prosecution in the court. As the court pointed out, I mean, you have a jury that's prescreened. You have all these incredible security measures. Witnesses are lined up ahead of time. I don't think it's unreasonable for the judge to say, you know what, if suddenly one person wants to go pro se without having any knowledge of core witness discovery, in the same way that their lawyers have had for the last six weeks, that that would really gum up the works and cause prejudice. I mean, that's what Fritz versus Spalding says the court could take into account, and that's what Kaczynski says as well. So that is at least with respect to Holmes. Now, with respect to Foreman, the point I would make is that at the end of the Farias opinion, it specifically says we go to pains to distinguish this case as one in which there was no finding of bad faith. In that case, that was the 1326, where there were only four months elapsed between arrest and trial. Here, there definitely was such a finding, and again, that's excerpt of record 67 through 74. That was, or those are, all the detailed findings the judge Subraw made. And not only that, at the January 29th hearing, Judge Subraw specifically made clear for the record that virtually all of the same concerns that he had with Mr. Hollins applied equally to Mr. Foreman. And so in that sense, he was able to clarify that the record, that the bad faith finding was made as to both people. That's what I understood. Both defendants, yes.  I mean, as I pointed out earlier, in Fritz v. Spalding, 1982, this court says in as many words, a self-representation request is timely if made before a jury is empaneled. Here, it's two weeks and 30 witnesses in. We have the United States v. Schaaf and the Jackson v. Ilse cases, specifically say the constitutional right of self-representation is waived if it is not timely and unequivocally asserted. But ironically, Judge Subraw didn't even rely on that. He borrowed as persuasive authority the Second Circuit's balancing test in Matsushita. If anything, he gave Ross a break in that sense by not automatically dismissing the request out of hand, and we would submit that he properly balanced the factors set forth in that test. And if there are any further questions on that. I'll give you a minute to address the Batson issue. With Batson, Your Honor, I think two main points. First of all, this peremptory challenge, as Judge Clifton has pointed out, was about Juror 47. The prosecutor put forth at least three pages worth of five race-neutral reasons why he struck that juror. The fact that her employment status was a temporary worker in a two-week trial, so she had no full-time benefits. She had a child care issue as the sole provider of an autistic child. She lived in the same neighborhood where the West Coast Crips operated. She had once witnessed a crime where the victim decided not to press charges, which involved witness intimidation, which was what this case was about, and that she appeared nervous when she was reading the questionnaire. When Judge Sobraw denied the Batson challenge, Supplemental Excerpt for Record, page 836, he said, I would find that those stated reasons are consistent with the record, consistent with the statements attributed to Juror 14. There has been no attempt to dispute those reasons. And even if the defense tries to pick two or three of them, our main fact is that those same constellation of five circumstances were not present in any other juror. Now, if that were the end of the question, I guess I would sit down. But we do have what the prosecutor offered to do. I would submit to this court. Defense tries to read it in the worst light possible. He is making a good faith effort, even if it is misguided, as Judge Clifton says. You know, if I'm going to be accused of racism, I'm not afraid. I am willing to put another juror on who didn't have any of those five problems that he had with Juror 14. Juror 67 lived in Carmel Valley, a half hour north of where the West Coast Crips operate. He's a retired engineer for one of the world's largest defense contractors were the words he used. He had eight children, seven of whom were adults, one of whom was in high school. He was relaxed enough to be cracking jokes. And although he witnessed two domestic violence cases, they didn't appear to impact him the same way as Juror 14. We would submit that that, how can that be evidence of racial animus? If the defense is saying we want representation, I think that's how he, the prosecutor said, if you're worried about representation, there's only one other black juror on the veneer. I'm willing to put this person forward. And the last point I would make, Your Honors, is I know with Batson, it is always a question of intent. This court does have a number of cases that say even when all is said and done, you look at how a jury is constituted. If there do happen to be challenged, you know, jurors from the challenged race on the panel, the petite jury panel, it's not dispositive, but it's indicative of non-discriminatory intent. I would submit that what the prosecutor was doing, you know, he would have ended up, if that juror 47 had ended up on the jury, he would have fallen squarely within that rule. Judge Zabraw expressly found no purposeful discrimination at Step 3 of Batson as he's required. The five reasons are not present in any other juror. And the one juror that the prosecutor offered to submit in her stead had none of those five issues. How anybody could infer something nefarious about that, I will leave to you. And I hope I didn't take all of them. No, that's okay. I'll give counsel some rebuttal. No other questions. Okay, thank you. Thank you. We're going to focus rebuttal exclusively on Feretta unless the Court has questions about other issues. Let me first briefly address Mr. Foreman's Feretta claim. And my opponent's suggestion that the district court's bad faith finding for Mr. Foreman was entirely justified, even under Farias. I note on page 1055 of Farias, 618, Fed 3rd of 1055, this Court's opinion notes, we express no opinion on whether after finding that a defendant seeks to proceed pro se for the purpose of delay, a district court may refuse to grant the defendant additional time to prepare. So Farias explicitly left that as an open question. So even if this Court were to determine, and we disagree, that Mr. Foreman was acting in bad faith by seeking a continuance while invoking his Feretta rights as of January 14, 2016, that nevertheless there is some opening in Farias for the Court nevertheless to determine that Feretta is such an important right that even under the stringent circumstances that Judge Sobral was insisting upon, a very firm trial date, that he had to express some willingness, some flexibility regarding the trial date such that Mr. Foreman could invoke his constitutionally protected right. How long had the case been pending at the time all this occurred? The case had been pending for quite some time, Your Honor. I believe it was, I actually don't have the exact date when it was first filed, but there have been, I believe, five superseding indictments in total, and a separate determination by Maine DOJ regarding whether to seek the death penalty against Mr. Graves, who's been severed out, and Mr. Holland. So these were lengthy proceedings, admittedly. But nevertheless, Mr. Foreman was determined to invoke his Feretta rights. He had first invoked them actually in a letter to the District Court on November 23, 2015, and he later withdrew that. So this wasn't the very first time that he had sought to invoke them. What's your response to the argument that we just heard that the District Court entered a protective order that was a disclosure of the cooperating witnesses? Certainly, Your Honor. What's your response to that? Regardless of the subjective motivations of Mr. Holland and Mr. Foreman, as of January 14, 2016, the District Court made it unmistakably clear that that AEO order, we'll refer to it by the shorthand, was not going to be changed. So they were clearly on notice that if they were to proceed pro se, they were going to be treated as if they were defendants. What can you say irrespective of the subjective motives? Because the subjective motives speak to the good faith, bad faith nature of the request. Now, there is a separate question, which I posed to your colleague and I'll pose to you. What will the case look like? It's all hypothetical. But suppose the request had been granted, convictions had been obtained, what kind of argument would defendants have now saying, well, I didn't have a meaningful opportunity to defend myself because I didn't have the information? That's the risk, it seems to me, the district judge has to weigh in trying to figure out how to proceed through this thorny situation. So what reason do you think the district judge should have not been concerned about that because that's not really going to be a problem? Even if I accept the proposition that it's not appropriate to evaluate the subjective motivation in terms of good faith, bad faith, it seems to me the issue for the district judge is, well, how do I put this process at risk by granting or denying this request? There's not a clear path. So what's the upside for the judge doing what you argue he should have done? Right. And I acknowledge the conundrum that Your Honor has identified. I think in a case like Kaczynski, which both I and my opponent have alluded to, there was considerable flexibility regarding the scheduling of dates in that case because of that particular district judge's practices and because of the unique nature of that case. So that's why there was significant deviation from the trial schedule, if you will. Here, there is much less of an opportunity for anyone to be concerned about the issues that you've identified, Judge Clifton, because Judge Sobraw, not only in this case but throughout his entire district court practice, is notorious, if you want to use that term, or at least well accepted as having very firm trial dates and very firm scheduling practices. So no one could have reasonably thought under those circumstances that anything would have turned out differently. Well, the lawyer couldn't, but defendants, were they quite as familiar with Judge Sobraw's practices as the lawyers sitting next to them were? Well, I think they had lived through the case for several years, Your Honor, and they were up close and personal, if you will, with Judge Sobraw, and they saw exactly how he conducted himself. I don't think they would have had any reasonable expectations under the particular circumstances of this case that Judge Sobraw would have been willing to deviate from the AEO order. I see my time has long since expired, but if there are no further questions, we'd be pleased to submit. I guess you can, if you have a question, go ahead. Are you prepared to answer any questions, Your Honor? We actually already talked about this, but Cohen and the motion to suppress, your argument is that that should be controlling law. It's a Second Circuit case, but you say that somehow that reasoning should... Yeah, our argument, Your Honor, is that none of the cases that the government has cited from this court have established that there is an unequivocal right by the government to engage in warrantless searches of pretrial detainees for any purpose whatsoever. The California Supreme Court's opinion in People v. Davis obviously does not bind this court. We note that Cohen, the Second Circuit case, does not. But we have argued that the reasons that the Second Circuit proffered in Cohen, namely that if you're not proceeding from a security-based reason intrinsic to the pretrial detention center, that didn't happen here, this was all directed externally. If the reason for the search has nothing to do with internal reasons at the pretrial detention center, therefore the government would then, given that we're dealing with pretrial detainees, not people serving custodial sentences, there would be a Fourth Amendment requirement for the government to seek a warrant before conducting something as invasive as setting up a recording device in a jail cell for three days and allowing the government to listen in on them. You don't place any stock in the fact that they did it because they were concerned about possible retaliation acts. They were all external threats, Your Honor. We acknowledge that... But they're still in custody in the jail. Whoever's running the building is in charge. You don't want your people making threats to people who are in your custody, making threats to other people, trying to dissuade them from testifying in your case. The decision to place the device in the cell, Your Honor, was solely based on directives from the San Diego Police Department working in consultation with the FBI, Special Agent Harding. So there was nothing unique to what was going on in that detention center, Bailey, that required the recording device to be placed in the cell. It was solely so that they could either, depending on which witness you believe, Special Agent Harding or Detective Maggi, was either to get evidence regarding the fallout from the Paris Hill homicide or to protect a witness that I believe was identified as DF. All those are external concerns. All of them, the government clearly could have patched together enough evidence to put in an affidavit, put in a declaration, and obtain a warrant. They decided to take a shortcut. And as Judge Katz has been alluding to Cohen, the rationale in Cohen should apply. The government should have obtained a search warrant, and it did not. Okay. I've given you plenty of time. Thank you very much, Your Honor. Okay. Okay. All those cases except for Graves, I believe, were submitted. So we'll take up United States v. Graves. Thank you, Your Honors. I know it's been a long morning, but Devin Burstein, on behalf of Mr. Graves, may it please the Court, I would like to begin with the sentencing issue, the 4573.6 and why that's not a predicate. I want to note that if the Court agrees with us on that issue and vacates a sentence on that basis, it need not reach the larger constitutional vagueness issue. And that's because if we go back for a resentencing, we'd be resentenced under the First Step Act. Under the First Step Act, none of these convictions qualify, and therefore we wouldn't have the vagueness issue in play any longer. So I think it's an opportune place to start. If I have additional time, I'm going to go to the buyer-seller and explain why I think that this case is different than Judge Clifton's decision in Moe. But jumping right into 45- I don't remember that one either. Okay. Well, that's okay. I did notice later that it was, oh, gee, I did that. Okay. I've got lots of quotes from it for you, Judge. So 4573.6, I'm just going to call it the prison statute because I think it's a bit easier. So we know from Ocampo, first and foremost, the categorical approach does apply in this 851-841 context. We know, second, that the California drug schedules are overbroad. The government concedes that this Court's cases are uniform in the fact that the California drug statutes are overbroad. And that really brings us to the crux of the issue, whether the prison statute 4573 is divisible or not. And it's our position that under Mathis and this Court's en banc decision in Martinez-Lopez, it is indivisible. That is, it cannot be divided. That is, the drug type are means, not elements. And to get there requires a little bit of a step back. So what Mathis... So when we're talking about divisibility, we're talking about means versus elements. When you have an overbroad statute, means versus elements. And what Mathis says is the threshold inquiry, just to quote, elements or means, in the easy case, it's when you have a state court decision that definitively answers the question. Then Martinez-Lopez en banc takes up that exact principle. And what Martinez-Lopez says is, we're going to look at a California decision to determine whether in the context of that statute, which was 11352, whether it's divisible. And what they say is, quote, with respect to the controlled substance requirement in that statute, we conclude that this is an easy case because a state court decision definitively answers the question. That state court decision is... A state Supreme Court decision. That's right. In that case, it's a state Supreme Court decision. But Mathis doesn't say that. It just says a state court decision. And in that case, it's Adams. And what Adams... That's the Martinez-Lopez. Martinez-Lopez is based on Adams from the California Supreme Court. And what Adams says, and its progeny have declared, is that if a person has multiple substances, they have marijuana and methamphetamine in their pocket, and they're prosecuted, they get two convictions. One for methamphetamine, one for marijuana. And that's how we know, the Ninth Circuit, our court en banc says, it's an element. And it says, and to quote, as a result of Adams and its progeny, defendants are routinely subjected to multiple convictions under a single statute for a single act as it relates to multiple controlled substances. Because the controlled substances each lead to an individual conviction, they must be an element. Therefore, for those typical California drug statutes, it is divisible. Each substance is an element. And then we have our statute. And it's not a typical California drug statute. And we have Rouser. And what Rouser does is the same thing. It cites Adams and its progeny. And it says, yes, in all of the typical drug statutes, these are elements. In other words, you have multiple convictions based on each individual substance. It says, the cases discussing multiple convictions for possession of discrete controlled substances were decided under a different statute than the one before us. This statute, Rouser goes on to say, is fundamentally different. This statute is not a drug statute. It's in a totally different part of the code. This is a prison statute. And in this statute, you don't get individual convictions for each substance. You have the exact opposite of Adams. Quote, we hold that contemporaneous possession in a state prison of two or more discrete controlled substances, here methamphetamine and heroin, at the same location constitutes but one offense under section 4573.6. In other words, that same example I started for the court where you have methamphetamine and marijuana in your pocket, under Adams and traditional California drug statutes, two convictions. Under Rouser and the prison statute, one conviction. That answers the divisibility question. Because you can have only one conviction for multiple substances, the multiple substances are therefore, ergo, means. It is the exact Adams-Martinez-Lopez situation in reverse. That's it. And that ends the inquiry. There's nothing more to be done. It's indivisible under that interpretation. Are there any other cases following Rouser in the state court of appeal? Yes, Your Honor. I was just shepherdizing it last night. And there are a number of cases much more recent who have taken on Rouser and followed it with regard to other types of possession, finding, yes, in other contexts, outside of the drug context, you can, that multiple possession, for example, not our favorite subject, but multiple possession of child pornography, just one offense. And that was a much more recent case. So yes, Rouser has been around since 1997 and has been cited many times and followed many times. Any of the districts outside of Rouser that have disagreed with Rouser? Not that I'm aware of. They've distinguished it in terms of other statutes, but nobody has held 4573.6 is like an Adams statute. And it makes sense. Look at the statute itself. It's not just about drugs. It's also paraphernalia. I mean, you can be convicted whether you had a pipe in your cell or marijuana or methamphetamine. And what Rouser says is, you can have methamphetamine, marijuana, cocaine, heroin, a pipe, a syringe, one offense. That's by definition. Well, what's the purpose of the statute? To protect prisons. It's a prison contraband statute. And if you go through Rouser, Your Honor, that's the whole discussion. This is not a drug statute. We know. I mean, we all know, right? The California drug statute is 11352, 11379. This is in a totally different part, and Rouser discusses that. This is in a totally different part of the penal code. It's not about drugs. It's about protecting the prisons. So in that sense, Mathis doesn't say, it has to be a California Supreme Court decision, whether it's a Supreme Court. It says, if there's a state court case that's good law and it's on point, it's easy. All you do is follow the decision. If you follow Rouser here, as Mathis instructs this court, it must. 4573.6 is indivisible. If it's indivisible, this case is at an end in terms of whether that was a predicate for the 851 enhancement. What is the significance of the 851 enhancement? It means to the mandatory minimum? Yes. So he was a double... Yes, Your Honor. But the district court said that's not what drove the sentence, that he was going to be sentenced to life anyway. That's not exactly accurate, Your Honor. The district court... The 851 hearing takes place a month before sentencing. The judge overrules the objections to the 851 and says, I'm going to impose. I find that both qualify. Therefore, it's a mandatory life. So because it was mandatory life, the district court says, Mr. Graves doesn't do a pre-sentence interview. There's no sentencing memorandum from the defense addressing the sentencing factors or objecting to making any other guidelines issues because it's academic, and the district court even later says it's academic. I think we can all agree that half a painting is not the whole picture, and that's what happened at sentencing. None of the mitigating evidence in favor of Mr. Graves was given to the district court. Now, we've talked a lot about Judge Subraw, but he's a conscientious judge, and I think any judge would admit that if I don't have any of the mitigating information before me, I can't really make a final determination whether I'm going to impose life or not. And it's not like there's none. That's not what I read his statement to be. I mean, he makes a point of going through and doing a 3553 analysis. But again, Your Honor, my point is that he's not given... He can only do the 3553 analysis on what's before him, Your Honor. And none of the mitigating evidence was put forward by the defense because it was academic at that point. He says, I think it's appropriate to set out the 3553 factors, I'm quoting, to perfect the record and to make clear that if the court were to exercise discretion, if it had any to impose a sentence less than life, it would not. But that sentence has to be taken in context. None of the mitigating evidence was presented to the court. There was no mitigation package presented to the court. There was no pre-sentence interview, nothing about his childhood, nothing about any of the other mitigating circumstances because it was all academic. It was a mandatory life sentence. And so the idea that this is harmless on a life sentence, I mean, I take issue with. I think the district... What does our case law say when there's sentencing here? So to quote from Gunning, when a district court could have lowered a defendant's sentence, we have presumed prejudice and remanded even if we doubted that the district court would have done so. So now, if you agree with me on 4573.6, the district court could have imposed a lesser sentence. Under Gunning, the court is, with all due respect, required to remand in that case.  Yes, Your Honor. I understand you to be arguing that the defendant's trial strategy would have been different had he not been subject to a mandatory minimum. Correct, and you see that at pages ER 414 and 415. The government gets upset when defense trial counsel says, we tried to settle this case. There's no offer and it's a mandatory life. We can't do that. So there's at least some evidence in the record that he would have pleaded guilty and sought a deal, and that would have reduced his guideline range to below life. Anyway, even now, were you to send it back, he could accept responsibility now and get two levels lower. There's also a number of guidelines issues that didn't have to be litigated because it was a mandatory life. There's a four-level enhancement that's there that we would litigate. There's a gun enhancement for two points. That's six levels that would be litigated. And there's a tremendous amount of mitigation. Remember, a mitigation package, it's not in the record. It wasn't before Judge Subraw, but a mitigation package was prepared when trial counsel went to central justice to argue against death penalty, which was successful. So there is considerable mitigation. All we're asking for is a quick one- or two-hour, maybe less hearing to present that evidence to the court. If the court imposes life, then the court's going to impose life, and we'll have a whole separate issue. But I don't think that's going to happen. I think if this case goes back, there's significant mitigating, and I think Mr. Graves will wind up with a sentence less than life. If there's no further questions... Is there time for rebuttal? Yes, and I'm happy to address buyer-seller if the court has questions. You want to address it for a minute? I'll give you another minute for rebuttal. Yes, Your Honor, thank you very much. So buyer-seller, it affects only count one. There are three requirements. One, it's a correct statement of law. Here it was a correct statement of law. There's no contention. It was the model instruction 9.19a. Two, that there's at least some evidence in the record. The government does its best to say there's not some evidence in the record, but there's no way to read this record honestly and say there's not some evidence that he was doing ad hoc drug sales. All the recorded sales are ad hoc drug sales. There's nothing in terms of methamphetamine that says it is absolutely not a buyer-seller. And all we have to have is a teeny bit of a small amount of evidence cutting the other way. And that brings us to the third point, and that's what Judge Clifton, you wrote about in Moe. And you said in Moe that the other instructions covered the buyer-seller. And just to quote, Moe says, the district court instructed the jury on the general elements of conspiracy. The instruction informed the jury that a conspiracy is a partnership and that in order to convict, the jury had to find that there was a plan to commit at least one other crime. And then the opinion states, the only other crime charged in the indictment concerned Moe's alleged distribution in Montana to other purchasers. So that's what Moe is saying. He was instructed you have to have a partnership, and the only other crime was downstream purchases. Here we have the opposite. The same instruction. You have to find that there was an agreement to commit one of the crimes alleged in the indictment. But the only other crime, there's marijuana conspiracy and possession with the intent to distribute. So there was no other crime that, unlike Moe, there was no other crime for downstream distribution. So for all the reasons Moe concludes the instruction wasn't required, here it was. Okay. Thank you, Aaron. Thank you. We'll hear from the government. May it please the court, Daniel Zipf on behalf of the United States. Your Honor, I'll start with the 851 enhancement. The district court was correctly applied the enhancement in this case. There is no real dispute that not only was the substance involved in the conviction marijuana, but the conviction documents would show under a modified categorical analysis that it was, in fact, marijuana that he was convicted of. The sole issue argued by my opponent is whether or not the statute is, in fact, divisible, such that the court can even look at these conviction documents to show that it's marijuana. In Martinez-Lopez, this court held that although the California drug tables are slightly broader than the federal definition, that the statute of the issue in that case is divisible and that the drug type isn't an element of the offense. Every other California statute that's been considered since then, this court has applied the same rule. To the health and safety code provisions. Correct. And that same rule would apply in this case. Why? This is a penal code provision. It's dealing with prison administration and safety and whatnot. Well, I think if you look, first of all, at the model California jury instructions for this offense, as in Martinez-Lopez, it lists one of the elements you have to prove with a blank as to what the actual substance was. Why isn't that just the means? And why would we look to a jury instruction when we have a state court of appeal opinion? Well, if the jury is required to find it, it's not the means. That's sort of the definition of what an element is. But as to the Rausser case, it's our position that that doesn't stand as clearly as the defense counsel argues for the proposition that the jury is not required to find a specific drug type in order to convict under this statute. Rausser was a case involving a three-strike sentencing law where the defendant ended up receiving two 25-year consecutive sentences based on the same stash that was found in his cell. And considering that, this court held essentially that you can't be convicted for two independent crimes for the same two different drugs inside your cell. What they didn't hold was that that element of what drug it was for either one of those was something that wouldn't have to be proven to a jury. And then, like I said, the jury instructions would require another court of appeals case, People v. George, approved of a jury instruction that required the jury to find a certain controlled substance. So I think this case, as with Martinez-Lopez and the other California cases, should be considered divisible. And in that case, the documents here show plainly that it was marijuana. Even if this court disagrees and finds that it's not a divisible statute and the district courts not have been able to consult those documents, our sort of backup position would be that this Taylor categorical analysis is, as this court held in Torres, a poor fit for sentencing determinations under the 851 statute. One of the reasons that the courts came up with and applied this modified and Taylor categorical analysis is to avoid an ad hoc mini-trial at sentencing to determine whether or not the documents match up with the statute. But that sort of ad hoc mini-trial is already statutorily required by 851. And what the district court did here was essentially that, to hold a hearing. The statute required the United States to provide notice of what it was intending to rely on. The defendant had to respond in writing, which triggered an automatic hearing. And at that hearing, the United States had the burden to prove beyond a reasonable doubt that these convictions qualified as a felony drug offense. Here, in this case, the court held a hearing. The United States called several witnesses, including a fingerprint expert, who tied these specific conviction documents demonstrating that it was marijuana, to the defendant's fingerprint. And the court found, beyond a reasonable doubt, that these conviction documents showing marijuana were felony drug offenses. So there's no need in this mini-trial context to resort to this sort of blindfolding of the categorical analysis where the court can't even consider what's been introduced at this evidentiary hearing. And then finally, I would just note that, even if the statute did not qualify as a felony drug offense, the court made it very clear in this case that it was going to apply a life sentence, regardless of whether or not the mandatory life sentence applied. The court said, I want to make it clear that if the court were to exercise discretion, if it had any, to impose a sentence less than life, it would not. And that wasn't just a standalone statement. The court opened with that, and then proceeded to go through all of the 3553 factors that supported a life sentence, even without the mandatory minimum. The court noted the substantial amount of drugs involved in the offense, the sort of lifetime of criminal activity with 24 years of sentences in the past 30 years, and then including a prior conviction for beating a man to death with a baseball bat. And then the court, and this is another critical quote from the district court, he said, the relevant conduct in this case showed beyond a reasonable doubt that Mr. Graved ordered the execution of a government witness. And that, standing alone, merits a life sentence. So we just had a discussion about that, and your colleague says that no mitigation presentation was made, issues weren't taken up, and so the judge was operating with what he described as half a picture, and accepts the proposition if it goes back and the rest of the picture is fleshed out. He expresses confidence, so there's no downside. He expresses confidence that a different sentence will result despite what the judge said in imposing this sentence. What's wrong with that? Well, Your Honor, I think a couple of things. First of all, the sort of idea that it would be easy to just go back over and have a redo, I mean, there would be real consequences to that. This was a case with multiple victims, multiple murder victims, sex trafficking victims, and this was something that was put to rest almost three years ago with the defendant receiving the sentence that he deserved. There would be some cost to sort of peeling that away and reopening and giving him another chance to come into court. And if you look at the record, it could not be more clear that that would be a waste of time and a futile exercise, given the fact that the court ticked through all of these 3553 factors that were overwhelming, most notably including... Do you agree that he didn't have sort of the mitigation evidence that he could sort of look at and consider as well? The defendant did not agree to meet with the probation officer, but... Well, he was going to get a life sentence, right? Yes, but I think if you look at what the court said, look, the court found beyond a reasonable doubt, and this evidence came in at the other trial, that Mr. Graves ordered this execution killing, that they sort of walked this man down a hill while he was crying and shot him to death because he was a cooperator. The court held that alone. Executing a witness standing alone is a life sentence. So it's difficult to see what would have changed that, even if he could present some unknown 3553 factors that were never introduced below. So our argument, again, Your Honor, would be this statute is divisible in the mandatory minimum applied to the extent that Taylor categorical analysis even applies in this context. And even if it's not, the court's decision was harmless in light of the court's statements. What's the best case that you might cite for the proposition that what happened here was in any event harmless, given the court's independent analysis? Sure, Your Honor. I think if you look at the government's opening brief at page 6, I don't have the names in front of me, but there's a string cite of about four different cases where courts have considered this same situation where an armed criminal act or various other statutes with mandatory minimum applied. And the court said, regardless of the mandatory minimum, I would have applied this anyway, and that that's sufficient to show harmlessness in this context. And that's the result we would ask you to come to here. Unless the court has any other questions about the substantive arguments. Thank you. Okay, thank you. You had some time for rebuttal, I think. Are we offered to give him time? We'll give you a minute. No, you're through. Okay, thank you very much. We appreciate it. It's been a long morning. Graves is submitted at this time, and thank you, counsel, very much. We appreciate your arguments. Very helpful. And we'll be in recess now. We're adjourned until tomorrow. Thank you.
judges: Paez, Clifton, Katzmann